Hall. Arguments on the receipt of $15,005, Mr. Professor, Mr. President, would you allow Mr. President to advise for rebuttal? Thank you. Good morning, Your Honors. I would request four minutes for rebuttal. Fine. May it please the Court, in granting some preliminary judgment in this matter, the District Court considered virtually every disputed material fact in a light most favorable to Miami, while at the same time simply ignored altogether those material facts which necessarily favored Dr. Thrash. In either or both events, the District Court failed to apply the most fundamental principles of law governing the District Court's decision rested solely on whether Miami's reasons for the negative tenure decision, which they proffered as Dr. Thrash's inadequate record of research, was a pretext for discrimination. The Court concluded as a matter of law that it was and therefore granted summary judgment in favor of the University. It seems that the decision rested on three essential points. First, that Dr. Thrash was not qualified for promotion and tenure, as a matter of law apparently. That Dr. Thrash did not have the same credentials as his Caucasian counterparts, again as a matter of law. And that even if the chair of Dr. Thrash's department, Dr. Lovanni, harbored a discriminatory animus against Dr. Thrash, that animus was purged during the balance of the tenure review process. And I will explain why each of those points are actually contradicted by the record. First, the District Court stated, quotes, there is no dispute that in January 2010, the tenure committee of Dr. Thrash's department found that plaintiff's application was, sub-quote, a very marginal case, end quotes. Well, that is disputed. The facts are quite the opposite. The contemporary record of the department's recommendation and opinion regarding the application for promotion and tenure of Dr. Thrash was unqualifiedly and unconditionally positive. It was a unanimous decision, whereby and wherein that department said, quotes, Dr. Thrash's scholarly work was sufficient to warrant promotion and tenure, both in quality and quantity, and that his work provided for future growth and development. There was no condition. There was no qualification. The District Court simply parroted the opinion of Miami and its argument and its brief. Second, according to the District Court, as relates to the external reviewers whose opinions were solicited by the department as part of the review process, the judge said, quotes, several were positive, several were lukewarm, and several were negative, end quotes. That description characterization of the external reviews was again lifted verbatim from Miami's also contradicted by the record. If you look at pages 33 and 34 of our appellate brief, we excerpt various portions of those external reviews. Four of the six reviewers were unqualifiedly positive and without any hesitation or condition said that his scholarly work entitled him to promotion and tenure in their view. Two were less enthusiastic than those four. However, even those two were positive with respect to recommendation for promotion and tenure. One said, well, I question somewhat the originality of Dr. Thrash's work, but I nevertheless find that he is at the appropriate level and recommend promotion and tenure, same with the sixth individual. According to the District Court, Miami produced evidence, quotes, that both of his Caucasian counterparts had far more significant research published and obtained grants that dwarfed plaintiff's contribution to the university, end quotes. That statement is contradicted by the record. The two professors with whom we were comparing Dr. Thrash, the two Caucasian professors, or non-African Americans, were Dr. Kerr and Dr. Omquist. Dr. Kerr did have more in grants, some 400,000, and we'll talk about Dr. Thrash's in a moment. Dr. Omquist had approximately $96,000 in grants. Dr. Thrash had a $147,000 collaborative grant with Central State, which was just totally ignored, ostensibly, I believe, because Dr. Levani did not place any weight in anything from historically black colleges and universities and doesn't even mention the nature or purpose of the grant or the fact that it was associated with the National Science Foundation. You've pointed out a number of things where the district judge is making judgments as to where the facts are, and this is a summary judgment case, and he's taking the facts in a light most favorable to the defendant, which is the movement for summary judgment. Assuming that we agree that that is inappropriate on the part of the district judge, are there other aspects that would allow the district judge's decision to be sustained? In other words, maybe it would be useful for you to move on to the other questions, such as did the arguable bias of Levani become insulated because there was the university-wide tenure committee or not? According to the district court, there's no dispute that the dean conducted a review independent of Dr. Levani as did the 13 members of the promotion and tenure committee, and therefore, again, from the district court's view, that process purged somehow whatever animus was harbored by Dr. Levani. There are two problems with that analysis. Number one, it's wrong as a matter of law. Second, it's wrong as a matter of fact. It's wrong as a matter of does not provide a safety net for even independent decisions or independently judgments administered or offered by decision makers. The question is whether those independent people and whether those independent judgments were in any way affected by the animus of the non-decision maker. That question was never posed. It was never addressed. If the district court had posed that question and if the district court had addressed that question, the district court would have had to have come to an entirely different decision because Dr. Levani's fingerprints, if you will, are all over the record. Again, the Sixth Circuit is clear on this point. We cite this in our brief. Neither independent investigation nor independent judgment on the part of the employer provides a per se defense. The question is, and again, this is the question that was posed by the judge, was there a causal connection between someone in the organization, Levani, who has alleged bias, and the adverse action? In other words, was the negative decision reasonably, arguably, a consequence in some way of Dr. Levani's animus? Well, let's start with the first decision maker after Levani. That's Dr. Dallar, the dean. The dean said in unequivocal language, I am informed by what I read. I make an independent investigation, but I am, quotes, definitely informed by what I am hearing from the chair. That's at Dr. Dallar's deposition at page 35. Moreover, Dr. Dallar expressly stated to Dr. Thrash that Dr. Dallar changed his opinion about the viability of Dr. Thrash's application for promotion and tenure, specifically because of what Dr. Levani had said and had concerning Dr. Thrash. And that's, Dallar says that in a deposition or something like that. Dr. Thrash testified that Dr. Dallar expressly told him that when Dr. Thrash questioned Dr. Dallar about why the change in attitude from his fifth year review, which was late in the spring of 2011, and then four months later when his promotion and tenure application was submitted, and Dallar explained to him, based on what Levani had told me and what I read, namely about your contributions and other aspects. If you remember, Dallar even wrote off a letter to the university council concerning whether or not Dr. Thrash had misrepresented his contributions on a letter, on a publication. And that was all the result of what Levani had offered to and told Dr. Dallar. The district court also ignored the testimony of Dr. Troy, who was the chair of the School of Engineering and Applied Science, who in combination with the dean participate in the process, in the promotion and tenure process at the level where the dean steps in. Dr. Troy testified, quote, the chair knows the most about a candidate, and therefore they give him considerable deference, and that the committee defers to the chair with the expertise in the area of academic specialization represented by the applicant. In this case, that was Dr. Levani. He is the only one on that committee, which is made up of all the chairs of all the departments who had specialization in the area of Dr. Thrash. And even more specifically in this instance, Dr. Troy believed that his committee, who sat with Dr. Levani during the deliberative process, received an explanation from Dr. Levani as to the reason for his negative letter. So Dr. Levani was there personally, was there to answer questions about his opinions, and he was the chair in whom all these people typically and understandably rely and defer. The district court further ignored the testimony of Dr. Schilling. He is the chair of the promotion and tenure committee, the university promotion and tenure committee. And I see that your red light is on. Oh, I'm sorry. If you wish to use your rebuttal time, you may, or you can save it for rebuttal. I would just add that Dr. Schilling echoed the same sentiments as Dr. Troy, that he typically as someone in that position relies heavily on the chair, and they had the chair's opinion. May it please the court, good morning. I'm Doreen Canton, and I represent the Appalese Miami University and Professor Shoshani Levani. The district court correctly ruled that the review of Dr. Thrash's tenure application by a number of faculty was an exercise of professional and academic judgment, not discriminatory intent. The faculty members who reviewed the application determined that Dr. Thrash's request for tenure should be denied, because in their judgment his research was not of the highest quality, nor did it show prospective continuation. Dr. Levani was not biased, and I'll talk about cat's paw first, because I think that's probably the most important part of this case. In Staub, which is the Supreme Court cat's paw decision, and in the Chapman case, which is a post-Staub Sixth Circuit decision, both of those courts explained how you can show cat's paw liability. You need an act of a biased supervisor, and then that act has to be the proximate cause of the decision. Now in both of those cases, in Staub you had a biased supervisor who made biased comments about her subordinate. I don't like that he's off on military duty. All they do is smoke and joke when they're on military duty. We've got to get rid of him because it's too hard finding people to cover his work. She made up a rule that he violated. Even if there was a rule he didn't violate, she told the higher-ups that he violated another rule and had to get terminated. And again, there was no rule. He had absolutely done what he was supposed to do. He had left a message for a supervisor and not walked off the job. In the other case, Chapman, you had a biased HR manager who made racist, derogatory comments about the employee, including the employee, and said, I talked to his supervisors, they want him fired. All the supervisors testified, no, we never said that. So the court said that the biased decision-makers in both of those cases passed along misinformation or selective information or flat-out lies. Now here there were allegations that were made that there was bias on the part of Lovanni that he refused to allow the list of references to include professors who were at historically black universities and colleges. There is that allegation. I just want to point out, first of all, that there is no allegation of any derogatory, racist, any kind of comments by Dr. Lovanni. And what Dr. Thrash testified was that Dr. Lovanni told him he couldn't use the professors on his list from historically black colleges and universities because he, Dr. Lovanni, did not think that they were qualified to review Dr. Thrash's research either because of the program they were in at the school they were in or because of their own publication record. And there's a two-page list in the record of the names that were given to Dr. Lovanni by Dr. Thrash with Dr. Lovanni's research on all of them. Dr. Lovanni didn't make a categorical exclusion of all professors who taught at a historical black college as being excluded, but he just excluded these particular faculty members? He excluded Central State University. Dr. Thrash had three professors from there, which is a historically black college. He excluded those. My question is, did he say, I will not accept anybody from a historically black college, or did he say, I'm not going to accept these people? Well, the record's mixed on that, but every time Dr. Thrash was asked what he said, he said, he said, I'm not going to accept anybody from a black college, and I'm not going to accept them because I don't think they're qualified to review your research. Okay, so that's what Thrash says that he said. Correct. And did Thrash say that in a deposition or some other sworn statement? Yes, in his deposition. That is evidence that must be considered on the summary judgment motion. Correct. The district judge, did the district judge say anything about that in his opinion? No. And we also have the contemporaneous records. We also have Dr. Thrash's testimony of the reason why they're not qualified to review your research. He also said the same thing about a professor from Kentucky, two professors from Iowa, and one from Wright State, which are not historically black colleges. He said, I don't think they're qualified either. For Central State, the reason was they don't have a chemical engineering department, which is the department Dr. Thrash was in. The three professors he listed were in manufacturing engineering. For North Carolina State was another one, not a black college that Dr. Thrash, no, and Dr. Levani said, I don't think that professor's qualified either. So eventually they came up with a list. Everyone on Dr. Thrash's list was minority. Eventually they came up with a list. I think it had at least four out of the six or seven were African-American, I believe. So they came up with a list eventually. Dr. Thrash also claims that Professor Levani was biased against African-American scholars because he dismissed Dr. Thrash's research with them. You heard about the $150,000 grant, but only $4,800 of that grant came to Miami. The rest was for Central State. So it wasn't where it was from, it was that this is not an amount that amounts to much of anything, especially when you compare it with somebody like Professor Omquist who had six figures worth of grants. So what we don't have here is, and what you see, it's a huge dossier. The entire dossier, it starts at the department level. The department was the first one to raise the issues that Dr. Thrash is upset that Dr. Levani mentioned. The department voted in Dr. Thrash's favor. Yes, but they have two long paragraphs about how they didn't like the tone of the external reviewer letters because it implied that he had somehow been disadvantaged at Miami. They noted that. They didn't like that. They spent two big long paragraphs talking about that. That's one of the things that Dr. Levani picked up on as he goes along. So what the upper levels of review got, they didn't get misinformation, they didn't get selective information, they got Dr. Levani's opinion in a six-page single-space type document analyzing, and if you read through it, he says a lot of very positive things about Dr. Thrash. He examines his research, but the upper levels of reviews, the one after Professor Levani, the dean comes next. He testified, I spent hours on this. I looked at everything. I looked at all the reviewers from the external reviewers. I looked at all of your records, all of your evaluations. I went back and I talked to the department promotion and tenure committee. I'm a little bit confused. Was Levani involved in upper level reviews, either by being there in person during the deliberations or by communicating to the upper level reviewers? He did not communicate to the upper level reviewers at all. How he was involved is the dean has an advisory committee called the School of Engineering Committee. You'll see the acronym SEES. It's the deans of all the schools and they all meet, and in that meeting each department chair talks about their candidate. Now that is not a one-on-one meeting and the dean was. So Dr. Levani was involved at that advisory committee point. He wasn't involved at the dean's level and he wasn't involved at the college promotion and tenure committee level. So the dean did a complete re-review, looked at everything, went back and talked to other people, and then when Dr. Levani requested a review, a reconsideration, he did more work. He did a graph, he did a chart, he studied the impact. There's all kinds of ways they measure the importance of journals that articles are published in and how they're cited. He went back and he did that. Then it goes to the promotion and tenure committee of the university. So now we're four levels up and there's 16 or 18 on that committee and they wrote a very extensive letter explaining what they did, which is in the record, and they said, again, we looked at all your reviews. We found the external reviews to be mixed at best, and I think if you look at them you would agree that they are mixed at best. They are not overwhelmingly positive. In fact, one person said, I can't comment on his research because I don't know anything about it. So that one was not very helpful. Absolutely, that wouldn't be held against somebody, that one of the reviewers says, I don't know much about the area, I can't comment. You just discount it, right, yeah. It just isn't there, it's not negative. They just ignored it, yeah. But you can't call it overwhelmingly positive either. You can't count it against somebody that there's an expert who's honest enough to say he doesn't know anything about the field. Correct, and maybe he never should have been a reviewer to begin with, but that's neither here nor there. If all the upper levels got was Dr. Lelvani's couple paragraphs that Dr. Katzpah case, because he would have selective information, or maybe you could spin it as misinformation, but they had everything, and they reviewed everything, and so the Romans case, the Sixth Circuit Katzpah case, says that if you, and I agree with Mr. Mezeboff, just because you have upper levels of review doesn't mean that you get a free pass and that means that there was no discrimination, but if there's no disinformation, there's no lies, there's no... But the basic problem is, if we hypothesize for the moment that Lelvani was biased, okay, so you're going to assume that, even though that's not your position. If you assume that Lelvani was biased, and he participates in an upper level review, he obviously has the potential for infecting that upper level review, and then from then on, that infection can go forward, unless there's a totally separate review at a higher level. And I understand you're not, you don't want to accept that hypothesis that Lelvani was biased, but if he were, and if he's at the dean's review later on, the dean of the school of engineering, the SEAS dean, and it sounded like both sides agreed that Lelvani was there. He was not at the dean's review, he was at this advisory committee meeting, and then the dean does his own review. So he listens to the advisory committee, he went back and he talked to the three people in Dr. Thrash's department, the department committee, he looked at all the evaluations, he looked at the journals, he looked at the, I mean, he did, as he said, I spent hours on this, I did not take it lightly, I looked at everything. Then he did a re-review so now we've got two reviews. Then the college committee, 18 more people, did a review, and then they did a re-review after a request for consideration. So by doing that, they break the chain, if there was anything that Dr. Lelvani had done, passed them wrong information, lied to them, they've got the whole dossier, it is hundreds of pages, they've got everything, they can read everything everybody wrote, and so to take one or two paragraphs out of a letter that Dr. Lelvani wrote that's not, I mean, it's his opinion, it's not a lie, he didn't do selective information. So that breaks the causal chain, according to the Roman's case, because there was independent levels of investigation, but they didn't just say, oh, Dr. Lelvani says no, I'm not going to look at anything else, I'll just rubber stamp that. There wouldn't be any point in having them go through this all if that was the case. And we do adamantly disagree that Dr. Lelvani was biased. I mean, there is no evidence. The reason he didn't want the people from those particular schools was he didn't think they were good enough or qualified enough. Well, suppose, again, hypothesizing that somebody says, I don't want to have any reviewers from any historically female institutions, because I think that historically female colleges are not up to snuff. Would that be a troubling statement about someone's views about women? If that was all they said, it would be troubling. If they said, I don't think these particular professors are qualified, and if they said the same thing about professors in male schools, if they said historically male schools, if there is such a thing, I guess there was, then it wouldn't. If he said, but I don't think the guy from Harvard or Princeton or whatever, they're not qualified either. Again, he's not category excluding them because they're from black schools. It's very clear, and I question Dr. Thrash over and over again, what did he say? You can think about any historically segregated type of education and say, well, there are other reasons, but basically it may well be that there's a deep-seated prejudice against that particular group. There could be, but then why would they wind up with a list that was almost all African American and that Dr. Thrash was satisfied with? I mean, they went back and forth. He said, out of 16 people, you didn't list one. He never said anything like that. He said, I don't think this one's good for this reason. I don't think this one's qualified. They went back and forth. Dr. Thrash came up with another African American professor from Ohio State. Dr. Lovanni said, fine, we'll put him on the list. Dr. Lovanni proposed another number. Probably four out of six were African Americans. And the final list, and it might be seven. I'm not sure. There was a backup, so four out of the six that he got reviews from were minorities, correct? My time is up. Okay, thank you very much. Your Honor, first, let me correct the record so there's no dispute as to this. The exclusion of reviewers from the historically black colleges was categorical. It was not an ad hominem appreciation or consideration of any one of the professors. It was, I will not accept any reviews or reviewers from historically black colleges. They're not qualified. Period. The end. Does that show that he was animus against African Americans? If four out of six were African Americans, it simply could show whether rightly or wrongly he didn't think those people were up to snuff. Well, it could, but he never considered any of the individuals. He just considered carte blanche, point blank. If they're from those schools, they're not going to be on the committees because I don't believe the scholarship from those schools. Those all six ultimately were African Americans. And he said what you said he said about historically black universities. Well, I think someone could still weigh whether or not he has an animus against scholarship that is affiliated with African American education, African American history. I don't know. That's something fact finders can consider. Fact finders might also could. He had all six who were African Americans. But we didn't. He probably had four out of six. Well, and those were. My hypothetical, however. No, I understand. But Dr. Thrash had provided 12. He cut it down to, I think, six. They went back and forth. And ultimately. Thrash had provided only African Americans. I believe that's true. I believe that's true. I believe that's true. But they ended up, put the two non-African Americans on the committee. That's what Dr. Lavani did. But Dr. Lavani, there's more than this. If you look at the record, you'll recall that Dr. Thrash. Providing only 12 names and only African Americans. What does that say about the person who's submitting only African American names? I think it probably shows that he is more familiar with, because of his history, his educational experiences, his networking, and just the way that academia works, that he is more acquainted with those persons who are African American. And for those reasons, those are the names he selected. But that doesn't mean those persons are any less qualified than Caucasians. But apparently, Dr. Lavani, at least based on his statement, had an opinion about that. He also had an opinion about Dr. Thrash. He misrepresented Dr. Thrash as higher. Dr. Thrash was one of 50-some individuals who applied for this position. He came in second of those 50-something. That was totally ignored by Lavani, who considered him only an opportunity hire, and who testified that he was hired only because of the color of his skin. Does that prove that he's biased? Does that prove that he's biased? No, I think it raises an inference of whether or not he's biased. I'm not saying he is biased. I don't know whether he's biased. But it certainly suggests that he viewed Dr. Thrash differently, and then he treated him differently. He treated him differently than he did Dr. Omquist, with respect to the fact that Dr. Omquist had external reviewers who said unequivocally, she doesn't deserve promotion and tenure. Another individual said he had serious doubts about the quality of her scholarship. None of that is mentioned in Dr. Lavani's opinions about her. Same with regard to the grants. I didn't finish before, but Dr. Thrash had applied for and was given a $100,000 grant. It applied for before his application for promotion and tenure was decided. It was approved, and he made Lavani know that that was in the pipeline, and it was shortly thereafter accepted. Dr. Skilling testified, there's no reason why that could not have been credited to Dr. Thrash, which would have given him more money in than Dr. Omquist. Counselor, Judge Spiegel, at page 9 of his opinions, says the following. There is no dispute that the dean conducted a review independent of Lavani, as did the 13-member tenure committee. Under these circumstances, no reasonable juror could find merit to plaintiff's catpaw theory that Lavani's alleged animus caused the ultimate decision. What do you claim is the dispute, the factual dispute, that the dean's review was not independent of Lavani? Dr. Thrash testified, Dr. Dollar testified that he gave considerable deference to the opinions of the chair, because he is the one who knows the candidate best, and he's the one who is in that area of specialization. He gave some deference, but he made a review. But the Supreme Court and the Sixth Circuit both say the fact that he made an independent review and he sat in a room by himself and read the same materials, that's an independent review. But that does not mean by definition or otherwise that his opinions are not tainted by what he's reviewed, which includes Lavani's opinions. Is the standard proximate cause that Lavani's bias infected it to a level of proximate causation, or is it just... That's an issue of fact. Is that the standard, though? Yes, it's a question of fact, whether or not... No, is the standard proximate cause... Oh, yes, yes, I'm sorry. ...a lesser standard? Yeah, no, it's a reasonable evidence that it was a proximate cause, a proximate cause, not the proximate cause, a proximate cause. His involvement was manifest in every level of the review, from the dean who testified that he was affected by it. Dr. Troy testified, Lavani was on the committee, was there, they spoke to him, he spoke to them, they had his opinion, they deferred to his opinion, as they always do because he's the one with specialization. Skilling said the same thing, we always defer to the chair because he's the person with the expertise. There's not a single area in which he was not involved. This is completely distinguishable from the Roman's case. Thank you. Your red light is on. Thank you. Thanks very much. Thank you both for your argument. The case will be submitted...